2004 OK CR 37

**D'Angelo James PINK, Appellant**

v.

**STATE of Oklahoma, Appellee.**

No. F–2003–191.

Court of Criminal Appeals of Oklahoma.

Dec. 22, 2004.

William P. Widell, Attorney at Law, Tulsa, OK, attorney for defendant at trial.

Yvonne Glick, Lisa Weintraub, Assistant District Attorneys, Tulsa County District Attorney, Tulsa, OK, attorneys for the State at trial.

Thomas E. Purcell, Appellate Defense Counsel, Norman, OK, attorney for appellant on appeal.

W.A. Drew Edmondson, Attorney General of Oklahoma, Keeley L. Harris, Assistant Attorney General, Oklahoma City, OK, attorneys for appellee on appeal.

## OPINION

CHAPEL, Judge.

¶1 D'Angelo James Pink [1] was tried by jury and convicted of Robbery with a Dangerous Weapon AFCF, under 21 O.S.2001, § 801 (Count I), and Conspiracy to Commit Robbery with a Dangerous Weapon AFCF, under 21 O.S.2001, § 421 (Count II), in Tulsa County, Case No. CF–2002–3670.[2] In accordance with the jury's recommendation, the Honorable Jefferson D. Sellers sentenced Pink to imprisonment for thirty-five (35) years and a fine of $5,000 on Count I and imprisonment for ten (10) years and a fine of $2,500 on Count II. The court ordered the sentences to be served consecutively. Pink appeals his convictions and his sentences.

## FACTS

¶2 Just after 10:00 p.m., on March 30, 2002, Diana Bowman, an assistant manager at the Dollar General Store on East Admiral Place in Tulsa, Oklahoma, was robbed at knifepoint by David Lane and Kristifer Hellen, after she exited the store and got into her car.[3] Although three other female employees exited the Dollar General along with Bowman that night, and Bowman had hidden

1. Although Pink's first name is spelled "Deangelo" in much of the trial court record, it is spelled "D'Angelo" in the Judgment and Sentence documents and in all of the filings on appeal.

2. Pink was also charged with Possession of a Firearm AFCF (Count III), but the jury found him not guilty of this crime. Pink was tried along with Lisa Ann Yahola, who was likewise charged with one count of Robbery with a Dangerous Weapon and one count of Conspiracy to Commit Robbery with a Dangerous Weapon. Yahola was acquitted on both counts.

3. Conflicting evidence was presented regarding whether or not one of the robbers also had a gun.

the two bags of money that she was carrying under her shirt and store apron, the two robbers went directly to Bowman, demanded the money, and told her that they knew she had it—suggesting that they had inside information about who would be carrying Dollar General's deposits for the day.

¶ 3 The State's theory at trial was that the Dollar General robbery was masterminded by D'Angelo James Pink and that Pink entered into a conspiracy with Lane and Hellen, along with Misty Bryant and Lisa Ann Yahola, to rob the Dollar General.[4] David Lane testified at Pink's trial, as did Misty Bryant.[5] Lane, who was sixteen years old at the time of the robbery, testified that he and his friend, Kristifer Hellen,[6] contacted Earnest Ray Dean, Jr., known as "Uncle Ray," about making some money by committing some kind of crime.[7] Lane testified that Uncle Ray subsequently took them to the home of Pink, approximately two to three weeks before the robbery of the Dollar General, where they met with Pink and Bryant in the front yard. Lane testified that Pink told them that he had some "licks," meaning robberies, they could do to make some money. In particular, Pink told them that there was a Dollar General that they could rob, and Lane and Hellen indicated their willingness to do so.

¶ 4 Lane testified that although he saw Pink on one other occasion prior to March 30, 2002, it was not until that day that he and Hellen were informed, through Uncle Ray, that the robbery was to take place that very night. Lane testified that they were told to meet Pink at a Family Dollar store and that he and Hellen were picked up there, in a black or green Dodge Intrepid, by Pink and Bryant, with Pink driving. Lane testified that he had already painted his face and that Pink told Hellen to put on face paint as well, since they did not have masks. Lane testified that they drove by a home, which Pink indicated was the home of the person that they were going to rob, as well as the Dollar General store, where Pink pointed out the parked car that belonged to Bowman. Pink told Lane and Hellen that the woman they were to rob had long blond hair, would be wearing a long skirt, and that she would have two money bags. Pink also told them that she was a "church lady" and would be scared and would give the money right up. Lane testified that it was his understanding that Pink had an "inside person," though Lane was not told who the person was.

¶ 5 Lane testified that they dropped Pink off at a home and that Pink gave Hellen a knife to use in the robbery. Bryant then drove Lane and Hellen back toward the Dollar General, but Hellen got nervous and told Bryant that they needed a gun too. Lane testified that Bryant called Pink on her cell phone about getting a gun, and they then went to Pink's house to get one. After Bryant could not find the gun there, however, Hellen and Lane agreed to go ahead with the robbery with just the knife, and Bryant dropped them off at a cemetery near the Dollar General.

¶ 6 Lane testified that he and Hellen waited outside the Dollar General until a group of six women came out and that they had no trouble picking out the one described by Pink (i.e., Bowman). They confronted her just as she got inside her car, with Hellen holding the knife and Lane demanding that she give

4. Yahola was originally charged as "Lisa Ann Ross," but subsequent informations noted that she was also known as "Lisa Ann Yahola" and "Lisa Yahola Ross." At her joint trial with Pink, she was consistently referred to as Lisa Yahola. Yahola was a Dollar General employee at the time of the robbery, as well as a girlfriend of Pink's, and the State maintained she was the "inside person" who supplied the conspiracy with the information about Bowman and the money bags.

5. Lane and Bryant also testified at the joint preliminary hearing of Pink and Yahola.

6. The record in this case indicates that just before Pink's trial, Hellen, who was seventeen years old at the time of the robbery, pled guilty as a youthful offender to both the armed robbery and the conspiracy and was sentenced to eight (8) years imprisonment on both counts, to be run concurrently. Hellen did not, however, testify against Pink.

7. Dean was charged as a coconspirator and for the armed robbery, along with Pink, Yahola, Bryant, Lane, and Hellen, but he had not been apprehended at the time of Pink's trial. Lane testified on cross-examination that he, Hellen, and Dean were all members of the Blood gang.

them "the f——ing money." Lane testified that at first the woman handed him a bag with cleaning supplies in it, but then gave him a money bag when he told her the first bag wasn't the money. Lane testified that he and Hellen fled the scene without getting the second money bag, after one of the other Dollar General employees attempted to run over Hellen with her car. They ran to the cemetery, but after seeing that Bryant was not there, they burned their shirts, along with the plastic Dollar General money bag that had contained the money, and ran to a friend's home in the area.

¶ 7. Lane testified that Hellen then called Pink and that after waiting a while, due to all the police and helicopters in the area, Pink drove up in the Intrepid to pick them up. Lane testified that Bryant was in the passenger's seat and that three other people, including Uncle Ray, were in the back seat. Pink told Hellen and Lane to get in the trunk, because there wasn't enough room in the car, and they did so. Lane testified that after about twenty minutes the car stopped, and Pink opened the trunk and told them that they were then going to walk to his house, which the three of them then did. At Pink's home they went into Pink's bedroom, where the money was divided up three ways, between Pink, Hellen, and Lane, with a separate share for "someone else" being set aside. Lane further testified that after the money was divided, they bought some guns from Pink.[8] In particular, Lane bought a .380 and Hellen bought a 12 gauge and a .22 rifle.[9]

Afterwards Hellen and Lane were picked up by Uncle Ray.[10]

¶ 8 Diana Bowman's description of the robbery was largely consistent with that of Lane. Bowman testified that she was an assistant manager at the Dollar General at the time and that one of her responsibilities was to make deposits after her shift, when she was the manager on duty, as she was on the night of the robbery. She testified that although the store closed at 8:00 p.m., she and cashiers Joanne Deronmanis and Marcheri Smith, as well as manager Clara Dearman, were there until after 10:00 p.m. working and talking.[11] Bowman testified that they all went out together, but that as she reached her car and sat down, two white "boys" with painted faces appeared from near the side of the building, one of whom was holding a knife, cursed her, told her that they knew she had the money and that they had a gun, and to hurry up and give them the money.[12] Bowman testified that she had hidden the two money bags under her shirt and work smock, in the top of her skirt, but that when she reached her car she threw the bags on the floorboard. Initially, in her confusion, Bowman handed one of the boys a Dollar General bag containing candy. After he got upset, she found one of the money bags and threw it at him, just before Clara Dearman, in her car, came at the boys and attempted to hit one of them.[13] At that point the boys ran off toward the cemetery across the street. Bowman testified that after the police came and she called her husband, she also called her friend, Lisa Yahola, to tell her what had happened.[14]

8. Lane testified on cross-examination that there was around $3,000 in cash in the money bag and that each of the three men got around $800 of that money.

9. Lane also testified that while at Pink's home, they smoked some "weed" and that earlier in the day he had used "some coke" and "some meth."

10. At the end of his testimony, Lane acknowledged that he had already pled guilty in the case, in exchange for being treated as a youthful offender, but that he had not yet been sentenced.

11. Bowman testified that Yahola worked that day until 8:00 p.m., that she was picked up by "her boyfriend," D'Angelo Pink, in a grayish/greenish Dodge, and that Yahola would have known that Bowman would make the deposits for that day and that she would have two money bags instead

of one, since the afternoon deposit had not been made.

12. Bowman also testified that she later saw that the other boy had a little, black gun.

13. Bowman testified that one of the money bags contained around $3,800, while the other contained around $4,400, and that the boys stole the one containing approximately $4,400. Some portion of this money would have consisted of personal checks.

14. Bowman's account of the robbery was corroborated by Clara Dearman, who testified that she came by after the store closed that night to accompany Bowman in making the deposits. Dearman testified that when she saw that Bowman was being robbed, she got in her car and

¶ 9 Misty Bryant's testimony was likewise largely consistent with Lane's account of the conspiracy to rob the Dollar General and the carrying out of the robbery.[15] Bryant testified that she was living in Pink's home at the time of the robbery planning and actual robbery, along with Pink's "girlfriend" Mona Welch.[16] Bryant described the meeting in the front yard at Pink's home during March of 2002, at which Lane and Hellen and initially Uncle Ray were also present.[17] Bryant testified that Pink told Lane and Hellen about a "job" that he wanted them to do, namely, to rob a Dollar General. Bryant testified that Pink indicated that he had selected the Dollar General on Admiral because he had "inside information" from "somebody who worked there" about who would have the money bags, where they would be, *etc.*[18]

¶ 10 Bryant substantiated Lane's testimony about she and Pink picking up Lane and Hellen, on the night of the Dollar General robbery. Bryant testified that Pink was driving a green 2000 Dodge Stratus, which was owned by Mona Welch and regularly driven by Pink, and that Welch's two-year-old son was also in the car with them, because Welch was working. Bryant testified that one of "the boys" had on face paint and that the other one put on face paint in the car. Bryant described driving by Bowman's house and Pink telling the boys that Bowman would have the money under her shirt and wouldn't resist. Bryant testified that they dropped Pink and the baby off at Yahola's home and that Pink gave the boys a knife to use in the robbery. She noted that the boys

did not feel comfortable with just one weapon and that they attempted to obtain a gun, a .380, from Pink's home, but that she was unable to find it. Bryant testified that she dropped the boys off at a cemetery near Dollar General, where she was supposed to meet them afterward, but that she did not end up meeting them there.

¶ 11 Instead, she later picked up Pink at Yahola's home, and Pink told her that he knew the robbery had been accomplished, because Bowman had called Yahola and told her about it. Bryant further testified that she, Pink, Uncle Ray, and his girlfriend later picked the boys up at a private home.[19] Bryant described Pink telling the boys to get in the trunk and then driving to a school near Pink's home, where Pink let them out and the three of them began walking to his home.

¶ 12 Bryant testified that Pink told her to drop off Dean and his girlfriend and then meet him back at the house, which she did (still toting Welch's child). Bryant testified that when she returned to the home, Pink and the boys were in a bedroom, and there was a pile of money on the floor. Although Bryant did not know the exact division of the money, her understanding was that the "inside person" was going to get $500 and that the rest was split three ways, between Pink, Lane, and Hellen. Bryant further testified that Pink informed her that night that the inside person was Lisa Yahola. Bryant noted that she personally received no money for her role in the robbery, and that she did it to help out Pink, who she still had feelings for at the time.

---

drove straight at the men, in an attempt to hit them. She likewise testified that one of the men was holding a gun and that he aimed it at her.

15. Bryant testified that she had already pled guilty in the case, though she had not yet been sentenced, but that she expected the State to recommend that she serve five years in prison with two years of probation. On cross-examination Bryant acknowledged that she had also been charged with assault and battery and resisting arrest in a separate case, to which she had likewise pled guilty but not yet been sentenced, and that part of her deal was that the sentences in the other case would be run concurrent with her sentences for the conspiracy and robbery. Bryant also indicated that she expected the armed robbery charge against her to be amended to a non-violent offense, so that she would not be required to serve 85% of her sentence.

16. Welch was referred to as Pink's common-law wife during trial. Bryant further testified that though she and Pink had previously had a sexual relationship, they were just friends at the time.

17. Bryant testified that she had not met Lane or Hellen previously and that Uncle Ray brought them there.

18. Bryant testified, however, that Pink did not state who the inside person was, though the only person that she knew that worked there was Lisa Yahola, who she met through Pink.

19. Bryant testified that Welch's baby was again with them, in the back seat.

## ANALYSIS

¶ 13 In Proposition I, Pink argues that because his co-defendants David Lane and Misty Bryant were both "accomplices" to the armed robbery and the conspiracy of which he was convicted, and because their testimony was inadequately corroborated, his convictions must be reversed. This Court takes up the two crimes separately, beginning with the robbery with a dangerous weapon charge.

### A. Accomplice Testimony

¶ 14 The State does not dispute that Lane and Bryant were accomplices to the armed robbery, nor was there any dispute about this at the trial court level.[20] Oklahoma statutory law (Title 22, Section 742) specifically provides that the testimony of such accomplices must be corroborated by evidence that links the defendant to the commission of the crime:

> A conviction cannot be had upon the testimony of an accomplice unless he be corroborated by such other evidence as tends to connect the defendant with the commission of the offense, and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof.[21]

This Court has strictly enforced the § 742 requirement that corroborating evidence link

---

**20.** Pink's jury was properly instructed, in accord with OUJI–CR (2d) 9–30 (Supp.2000), that both Lane and Bryant were, in fact, accomplices to the crime of robbery with a dangerous weapon.

**21.** 22 O.S.2001, § 742.

**22.** See, e.g., Rider v. State, 1972 OK CR 56, ¶ 9, 494 P.2d 347, 350 ("[T]he evidence independent of the testimony of the accomplice must tend to connect defendant with the crime itself, and not simply with its perpetrators.").

**23.** 1998 OK CR 45, 968 P.2d 821, cert. denied, 526 U.S. 1162, 119 S.Ct. 2054, 144 L.Ed.2d 220 (1999).

**24.** Id. at ¶ 20, 968 P.2d at 830 (quoting Sadler v. State, 1993 OK CR 2, 846 P.2d 377, 383).

**25.** See Rutledge v. State, 1973 OK CR 107, ¶ 6, 507 P.2d 551, 552; see also Rider, 1972 OK CR 56, ¶ 9, 494 P.2d at 350 (same).

the defendant to the commission of the offense, and not merely to the admitted perpetrators of the offense.[22]

¶ 15 In *Cummings v. State*,[23] we recognized the "general rule" that testimony of an accomplice "must be corroborated with evidence, that standing alone, tends to link the defendant with the commission of the crime charged."[24] We have likewise described as "well settled" the interpretation of § 742 as requiring that "corroborative evidence must of itself, without the aid of the testimony of an accomplice, tend to some degree to connect the defendant with the commission of [the] offense,"[25] and noted that "independent evidence merely consistent with the main story is not sufficient to corroborate it if it requires any part of the accomplice's testimony to make it tend to connect the defendant with the crime."[26]

¶ 16 The State correctly notes that we have not required that the *quantity* of the independent evidence connecting the defendant to the crime be great, though we have insisted that the evidence raise more than mere suspicion. In *Cummings*, we recognized that an accomplice's testimony need not be corroborated in all material respects and that the amount of corroboration required is simply "at least one material fact of independent evidence that tends to connect the defendant with the commission of the crime."[27] We also recognized that circum-

---

**26.** *Rutledge*, 1973 OK CR 107, ¶ 6, 507 P.2d at 552; see also L.E.Y. v. State, 1982 OK CR 4, ¶ 6, 639 P.2d 1253, 1255 ("Corroborating evidence must tend to connect the defendant with the commission of the offense absent the accomplice's testimony.") (citing Jones v. State, 1976 OK CR 261, 555 P.2d 1061).

**27.** 1998 OK CR 45, ¶ 20, 968 P.2d at 830 (citing Johns v. State, 1987 OK CR 178, 742 P.2d 1142, 1146); see also DeLozier v. State, 1998 OK CR 76, ¶ 13, 991 P.2d 22, 26 ("If the accomplice's testimony is corroborated as to one material fact by independent evidence tending to connect the defendant with the commission of the crime, from that, the jury may infer that the accomplice speaks the truth as to all."), cert. denied, 528 U.S. 1023, 120 S.Ct. 535, 145 L.Ed.2d 415 (1999).

stantial evidence can be adequate to corroborate an accomplice's testimony.[28]

¶ 17 Nevertheless, the State simply did not present adequate independent evidence during Pink's trial to connect him with the actual armed robbery of the Dollar General. While the accomplice testimony of Lane regarding how the robbery occurred was strongly corroborated by the independent testimony of Diana Bowman and also Clara Dearman, nothing within the testimony of these women connected Pink to the actual robbery. Although Bowman testified that she saw Pink pick up Yahola at the Dollar General in a grayish/greenish Dodge, over two hours before the robbery, this merely connected Pink to one of the alleged accomplices (who was ultimately acquitted) and the crime scene, but was not close enough in time to the robbery to constitute adequate corroboration.

¶ 18 The State focuses upon evidence connecting Pink to the green Dodge that both Lane and Bryant described as being used in the robbery, and the State did present substantial independent evidence to establish that Pink sometimes drove that particular car.[29] Unfortunately, no evidence—apart from the testimony of Lane and Bryant—connected the Dodge to the actual commission of the robbery, since neither the victims nor any other independent party observed

the Dodge during the robbery or near the time of the robbery. Hence independent evidence connecting Pink with the car is not adequate to connect him with the armed robbery of the Dollar General.

¶ 19 The State also notes that Bryant's testimony that Pink told her (on the night of the robbery) that he knew the robbery had been accomplished—because Bowman called Yahola and told her about it—was corroborated by the fact that Bowman testified that she did call Yahola that night and tell her about the robbery. Once again, however, the material fact corroborated by this independent evidence, i.e., that Bowman called Yahola and told her about the robbery, still does not tend to connect Pink to the commission of the robbery. Without the testimony of accomplices Bryant and Lane, the fact that Bowman called Yahola does nothing to connect Pink with the Dollar General robbery.[30]

¶ 20 Although the State presented significant and uncontested evidence establishing that the Dollar General robbery occurred, and although much of this independent evidence corroborated accomplice Lane and accomplice Bryant's accounts of when and how it occurred, the State simply did not present adequate independent evidence that tended to connect Pink with the actual armed robbery.[31] The State's non-accomplice evidence

**28.** *Cummings*, 1998 OK CR 45, ¶ 20, 968 P.2d at 830.

**29.** In addition to Bowman's testimony, the State presented evidence that at 1:00 a.m., on March 14, 2002, Tulsa Police Officer Dianna Baumann stopped a green 2000 Dodge Stratus for having an expired tag. Baumann testified that the car was being driven that night by D'Angelo Pink and that Misty Bryant and Lisa Yahola were also in the car. Although this evidence again linked Pink with the car—and with one admitted accomplice and one alleged accomplice—it is simply inadequate to link him with the actual armed robbery, committed sixteen days later by two men with whom no independent evidence connected him. Separate evidence that another officer investigating the robbery later observed the same vehicle at the home of Yahola is even less significant, since the officer acknowledged that it was being driven that day by Mona Welch, its owner, and no evidence suggested that Pink was even present.

**30.** The State's final attempt at establishing adequate corroborating evidence is its argument regarding Pink's alleged prior knowledge about how much money Bowman would be carrying on the night of the robbery. Bryant testified that Yahola told Pink "approximately" (a word Bryant used twice) how much money Bowman would have and that the amount would be anywhere from $3,000 to $5,000. Bowman testified that Yahola actually totaled the afternoon shift's deposit, which was around $3,800, and that Yahola would have known there was a separate evening deposit (which turned out to be around $4,400). It is questionable whether Bryant's testimony about Pink's prior knowledge was even specific or accurate enough to be considered significantly corroborative. Regardless, the independent fact that was potentially corroborated, that *Yahola* had prior knowledge regarding the day's receipts, does not tend to connect Pink to the robbery, absent the testimony of accomplice Bryant.

**31.** The State's case against Pink largely parallels the evidence considered in *L.E.Y. v. State,* 1982 OK CR 4, 639 P.2d 1253. *L.E.Y.* involved a Christmas Eve burglary of a home by a group of

against Pink simply did not include the kind of evidence that we have found to be adequately corroborative in the past, such as evidence of stolen goods found in the defendant's possession, the testimony of non-accomplice associates of the defendant, or admissions by the defendant.[32]

■ ¶ 21 While we are reluctant to reverse the verdict of a properly instructed jury, and Pink does not dispute that his jury was instructed according to the uniform instructions applying to accomplice testimony,[33] one further point that may help to explain the jury's armed robbery verdict is worth noting. Pink's jury was instructed in accordance with Oklahoma's Uniform Jury Instructions (OUJI–CR) that are designed for cases involving accomplice testimony. In particular, Pink's jury was instructed (in Instruction No. 29) as follows:

In determining the question as to whether or not the testimony of an accomplice has been corroborated, you may eliminate that testimony entirely and then examine all of the remaining testimony, evidence, facts, and circumstances, and ascertain from such examination whether there is any evidence tending to show the commission of the offense charged and tending to connect the defendant with the offense. If there is, then the testimony of the accomplice is corroborated.

This instruction accurately tracks OUJI–CR (2d) 9–32 (Supp.2000). The word "may" in the instruction, however, is not consistent with our law regarding adequate corroboration of accomplice testimony, as described above. The word "may" in the context of this instruction (as opposed to language such as "must be able to") could leave the jury with the impression that the analysis described—of eliminating the accomplice testimony and then examining the remaining evidence for something that tends to connect the defendant with the commission of the crime—is optional, and that perhaps the State's "corroborating evidence" could be deemed adequate even where it could not pass this test.

¶ 22 While this possible interpretation may not seem problematic in every case, in Pink's trial the prosecutor actually argued that this was the *proper* interpretation and that, contrary to defense counsel's earlier argument,[34] the jury need not find that the evidence passed this particular test. The prosecutor invoked the language of the accomplice instruction quoted above (and the parallel conspiracy instruction) and emphasized that the instruction says "you may" eliminate the testimony of the accomplice/conspirator and then apply the stated test. She continued, "It doesn't say you must. It doesn't even say you should. It just says you may." This Court finds that this prosecutorial argument substantially enhanced the possibility that

juveniles. One of the juveniles, Steve Raines, testified regarding who else was involved and what they each did, but the only independent evidence regarding defendant L.E.Y. was that at some point during the evening, he was seen in the home of one of the other juveniles (in whose home the police later found some of the stolen property) and that he was seen leaving with yet another juvenile, carrying guns and ammunition (which might have been stolen). This Court had no trouble concluding that such evidence did not adequately connect L.E.Y. to the burglary, *id.* at ¶ 7, 639 P.2d at 1255, noting that corroborating evidence is "insufficient if it does no more than connect the defendant with the perpetrators but not the crime." *Id.* at ¶ 6, 639 P.2d at 1255.

**32.** *See, e.g., Rider,* 1972 OK CR 56, ¶ 10, 494 P.2d at 350 (accomplice burglary testimony adequately corroborated by finding of stolen guns in car occupied by defendants on day of burglary); *Jemison v. State,* 1981 OK CR 99, ¶¶ 5–7, 633 P.2d 753, 754 (accomplice armed robbery testimony

adequately corroborated by non-accomplice associate, who overheard defendants making plans for robbery, and to whom defendants made admissions afterwards and displayed proceeds); *DeLozier,* 1998 OK CR 76, ¶ 15, 991 P.2d at 26–27 (accomplice murder testimony adequately corroborated by defendant's admissions regarding circumstances surrounding murders). The State presented no independent evidence connecting Pink with the money bags stolen from Dollar General or any statements by Pink whatsoever.

**33.** *See* OUJI–CR (2d) 9–25, 9–26, 9–27, 9–28, 9–30, 9–31, and 9–32 (Supp.2000), all of which were given to his jury.

**34.** Pink's counsel had argued that in order to convict Pink under Instruction No. 29 (and the parallel conspiracy instruction), the jury needed to be able to throw out the testimony of Lane and Bryant and find adequate corroboration in the testimony of persons like Bowman and Dearman.

Pink's jury would misunderstand the adequate corroboration requirement contained in its accomplice instructions, which may likewise help explain the jury's apparent, but mistaken, decision that adequate corroboration had been established.

¶ 23 The Court recognizes that the prosecutor's argument was based upon a reasonable construal of the word "may," which made her argument particularly dangerous in the context of this case, because the test articulated is not truly discretionary or optional under our law. Under Oklahoma law, the jury *must* be able to eliminate the testimony of an accomplice (or accomplices) and still be able to find some separate evidence that tends to connect the defendant with the commission of the charged offense.[35] Hence we hereby find that OUJI–CR (2d) 9–32 must be and hereby is modified to state as follows:

> **In determining the question as to whether or not the testimony of an accomplice has been corroborated, you must be able to eliminate that testimony entirely and then examine all of the remaining testimony, evidence, facts, and circumstances, and ascertain from such examination whether there is any evidence tending to show the commission of the offense charged and tending to connect the defendant with the offense. If there is, then the testimony of the accomplice is corroborated.**

In trials following the publication of this opinion that involve accomplice testimony, the jury shall be instructed according to this modified version of OUJI–CR (2d) 9–32.

¶ 24 Regarding Pink's trial, this Court finds that the State did not adequately corroborate the accomplice testimony of Lane and Bryant connecting Pink to the armed robbery of the Dollar General.[36] Hence Pink's conviction for robbery with a dangerous weapon must be reversed.

## B. Coconspirator Testimony

¶ 25 Pink apparently assumes that if his armed robbery conviction falls, so too does his conviction for conspiracy to commit robbery with a dangerous weapon. This is not necessarily the case. Although accomplices can be coconspirators and vice versa, and although both accomplice law and conspiracy law involve special considerations regarding "group crimes," the terms are not synonymous, nor is the law applying to accomplices and coconspirators identical or even fully parallel.[37] In fact, the current case demonstrates how important it is to recognize the distinction between Oklahoma law regarding accomplices and their testimony and our law regarding coconspirators and their testimony.

¶ 26 Pink's jury was instructed according to the OUJI instructions regarding coconspirator testimony that correspond to the OUJI instructions applying to accomplice testimony.[38] These instructions mandate

**35.** *See* cases cited *supra* in notes 22–26 and accompanying text. In addition, the Committee Comments to the current OUJI–CR (2d) 9–32 (Supp.2000) state as follows: "[E]xecution of the statutory policies expressed in section 742 mandates that the corroborating proof be independent of the testimony of another accomplice."

**36.** *See also Burkhalter v. State,* 1963 OK CR 40, ¶¶ 6–13, 380 P.2d 718, 719–20 (reversing larceny conviction where accomplice testimony not adequately corroborated by evidence linking defendant to crime); *Rodriques v. State,* 1965 OK CR 114, ¶¶ 13–19, 406 P.2d 506, 508–09 (same).

**37.** *See, e.g.,* 15A C.J.S. Conspiracy § 103 (2002) ("Conspiracy to commit a crime and aiding and abetting in its commission are distinct offenses.... It is the requirement of an agreement to participate in a criminal scheme that distinguishes a conspiracy from the related offense of aiding and abetting, which, although often based on an agreement, does not require proof of that

fact.... Neither aiding and abetting nor conspiracy can be established by mere acquiescence; instead, it must be proven that the defendant either helped or encouraged, for aiding or abetting, or agreed to help, for conspiracy, in the commission of a crime."); 16 Am.Jur.2d *Conspiracy* § 3 (1998) ("The relevant difference between conspiracy and accomplice liability is that, while an agreement is an essential element of the crime of conspiracy, aid sufficient for accomplice liability may be given without any agreement between the parties. Accordingly, conspiracy has been adjudged a separate and distinct offense from that of aiding and abetting, since it involves the additional element of preconcert and connivance not necessarily inherent in the mere joint activity common in aiding and abetting.").

**38.** In particular, Pink's jury was instructed in accordance with OUJI–CR (2d) 9–33, 9–35, 9–37, 9–38 and 9–39 (Supp.2000), which apply to coconspirator testimony, and which track the lan-

that coconspirator testimony be evaluated according to the same requirement of independent corroborating evidence that has been summarized above as applying to accomplice testimony. The basis for this requirement in Oklahoma conspiracy law, however, is highly dubious.

¶ 27 The source of the requirement regarding accomplice testimony is quite clear, namely, Oklahoma Statutes, Title 22, Section 742, which was quoted above. This provision applies specifically to "the testimony of an accomplice,"[39] however, and there is no corresponding statutory provision applying to the testimony of coconspirators. The OUJI "Committee Comments" following OUJI–CR (2d) 9–39 (Supp.2000), which articulates one of the tests for adequate corroboration of a coconspirator's testimony, state, revealingly, as follows: "Although little authority supports the necessity for corroboration of testimony of a coconspirator, the Commission has discerned little logic in distinguishing the testimony of an accomplice from that of a coconspirator in this regard."

¶ 28 On the other hand, the former OUJI–CR (2d) 9–17, which was titled "Evidence—Statements and Acts of Coconspirators," now states "NO INSTRUCTION SHOULD BE GIVEN." The Committee Comments corresponding to this non-instruction note as follows:

Once the judge decides that a coconspirator statement is admissible, the jury may consider the statement as it would any other evidence, and a special instruction is neither necessary nor appropriate. *See Laske v. State*, 694 P.2d 536, 538 (Okl.Cr. 1985) (judge decides whether the State has introduced sufficient independent evidence to prove the conspiracy).[40]

Hence Oklahoma's Uniform Jury Instructions provide conflicting signals about whether a jury should be given special instructions regarding coconspirator testimony, and in particular, whether such testimony should be evaluated in the same manner as accomplice testimony. And because Pink's claim that his conspiracy conviction should be reversed for inadequate corroboration by independent evidence implicitly rests upon a claim that such corroboration is required, this Court must resolve this conflict in order to resolve his appeal.

[4] ¶ 29 Upon reviewing our statutes and this Court's extensive conspiracy jurisprudence, we conclude that Oklahoma law does not require that coconspirator testimony be evaluated according to the independent corroboration requirement that applies to accomplice testimony and hence that the OUJI instructions asserting and explaining such a requirement are inaccurate, misleading, and should not be given to juries.[41]

[5] ¶ 30 Under Oklahoma law, a "conspiracy" is an agreement between two or more persons to commit a crime, plus an overt act in furtherance of that agreement.[42] This

---

guage of OUJI–CR (2d) 9–25, 9–28, 9–30, 9–31, and 9–32 (Supp.2000), respectively, which apply to accomplice testimony. It should be noted that OUJI–CR (2d) 9–36 (Supp.2000), which is used where the issue of whether a witness is a coconspirator is treated as a jury question, likewise tracks the language of OUJI–CR (2d) 9–29 (Supp. 2000), which is used where the issue of whether a witness is an accomplice is treated as a jury question. In addition, OUJI–CR (2d) 9–34 (Supp.2000) defines the term "coconspirator," just as OUJI–CR (2d) 9–26 (Supp.2000) defines "accomplice." Finally, OUJI–CR (2d) 9–27 (Supp.2000), which defines "corroborating evidence," does not have a corresponding separate instruction among the coconspirator instructions.

39. *See* 22 O.S.2001, § 742.

40. See OUJI–CR (2d) 9–17 (Committee Comments). The Committee Comments also cite *United States v. James*, 590 F.2d 575, 580 (5th Cir.), *cert. denied*, 442 U.S. 917 (1979), in this regard.

41. **In particular, OUJI–CR (2d) 9–33, 9–35, 9–36, 9–37, 9–38, and 9–39 (Supp.2000) are erroneous and should no longer be used.** Although OUJI–CR (2d) 9–34 (Supp.2000), which simply defines the term "coconspirator," is not misleading or inaccurate, it will likely be rendered unnecessary by the elimination of the surrounding instructions.

42. *See* 21 O.S.2001, §§ 421, 423; *see also Pearson v. State*, 1976 OK CR 297, ¶ 19, 556 P.2d 1025, 1030 ("[T]o constitute the crime of conspiracy in Oklahoma, two essential elements are required: an agreement between two or more people to commit an unlawful act, and some overt act by one or more of the parties in furtherance of this agreement."), *cert. denied*, 431 U.S. 935, 97 S.Ct. 2644, 53 L.Ed.2d 252 (1977). The United States Supreme Court has likewise re-

Court has long recognized that "[t]he crime of conspiracy, by its very nature, is a crime clothed in secrecy and is very seldom proved by direct evidence."[43] Hence we have allowed the State to establish the existence of a conspiracy through indirect proof and circumstantial evidence.[44] On the other hand, we have recognized the possible dangers inherent in the admission of such evidence, particularly when the State is attempting to rely upon statements made by coconspirators during the course of the conspiracy alleged.

■ ¶ 31 In *Omalza v. State*,[45] this Court reviewed and summarized Oklahoma law regarding the presentation of a coconspirator's statements during a conspiracy trial. We noted that under Oklahoma law, "[a] statement which is offered against a party and made by his coconspirator during the course and in furtherance of their conspiracy is admissible and is *not* hearsay."[46] We recognized, however, that before a coconspirator's statement can be admitted into evidence against the defendant charged with conspiracy, the trial court is required to hold an *in camera* hearing, often referred to as a *Harjo* hearing,[47] to determine whether a conspiracy actually existed, under a "preponder-

ance of the evidence" standard.[48] We also noted the following limitations on such evidence:

> A coconspirator's statements satisfy the requirements of reliability and are admissible as non-hearsay substantive evidence only where the trial court finds: [1] a conspiracy existed; [2] both the defendant and the alleged coconspirator declarant were parties to the conspiracy; [3] the statements were made during the duration of the conspiracy; and [4] the statements furthered the goals of the conspiracy.[49]

In addition, we noted in *Omalza* that it is imperative that the trial court not only insist that these requirements be satisfied before finding that a coconspirator's statements are admissible against a conspiracy defendant, but that the court likewise ensure that statements outside the context of this "conspiracy exception" to the hearsay rule not be admitted (such as statements made prior to the beginning of the conspiracy or by non-conspirators), unless they come in under some other rule of evidence.[50]

■ ¶ 32 Oklahoma law does not, however, require that a coconspirator's testimony be evaluated under the test for independent cor-

cently noted that "the essence of a conspiracy is 'an agreement to commit an unlawful act.'" *United States v. Jimenez Recio*, 537 U.S. 270, 274, 123 S.Ct. 819, 822, 154 L.Ed.2d 744 (2003) (all citations omitted).

**43.** *Fetter v. State*, 1979 OK CR 77, ¶ 10, 598 P.2d 262, 265; *see also Pearson*, 1976 OK CR 297, ¶ 20, 556 P.2d at 1030 (same).

**44.** *Id.* ("Existence of a conspiracy need not be established by direct evidence, but proof of circumstances from which existence of a conspiracy may fairly be inferred is sufficient.") (citation omitted).

**45.** 1995 OK CR 80, 911 P.2d 286 (per curiam).

**46.** *Id.* at ¶ 13, 911 P.2d at 295–96 (emphasis in original) (citing 12 O.S.1981, § 2801(4)(b)(5)); *see also Armstrong v. State*, 1991 OK CR 34, ¶ 14, 811 P.2d 593, 597 (same). The provision relied upon in *Omalza* and *Armstrong* can now be found at 12 O.S.Supp.2002, § 2801(B)(2)(e).

**47.** *See Harjo v. State*, 1990 OK CR 53, ¶ 25, 797 P.2d 338, 345 (holding that during the *in camera* hearing regarding the admissibility of statements of a coconspirator—required under the Court's prior decision in *Laske v. State*, 1985 OK CR 7,

694 P.2d 536—the trial court may consider the statements of an alleged coconspirator within its determination of whether a conspiracy existed).

**48.** 1995 OK CR 80, ¶ 13, 911 P.2d at 296. The exception to this rule is for a coconspirator's live, in-court testimony at trial. *See Johns v. State*, 1987 OK CR 178, ¶ 8, 742 P.2d 1142, 1146 (holding that a coconspirator's live trial testimony about his conspiracy with the defendant is not hearsay: such a witness's statements about his own participation and observations are not hearsay at all; and the witness's testimony about statements by his accused coconspirator are admissible as party admissions); *see also Huckaby v. State*, 1990 OK CR 84, ¶ 13, 804 P.2d 447, 451 (no need for *in camera* hearing or "independent evidence connecting [defendant] to the conspiracy," where coconspirator testifies during conspiracy trial) (citing *Johns*); *id.* at ¶ 14, 804 P.2d at 451 (coconspirator's in-court testimony can constitute sufficient evidence of both conspiracy and defendant's participation in conspiracy); *Hackney v. State*, 1994 OK CR 29, ¶ 4, 874 P.2d 810, 813 (citing *Johns* and *Huckaby*).

**49.** 1995 OK CR 80, ¶ 13, 911 P.2d at 296.

**50.** *Id.* at ¶ 14, 911 P.2d at 296.

roborating evidence that is applied to accomplice testimony. Although there may have been occasions when this Court's opinions seem to use the terms "coconspirator" and "accomplice" interchangeably,[51] the terms are not synonymous, nor are the standards for evaluating the testimony of such persons the same. Even when the individual testifying is both an accomplice and a coconspirator—a not uncommon scenario—the sufficiency of the witness's testimony regarding the "primary crime" (e.g., robbery, murder, fraud, etc.) must be evaluated separately from the appropriateness and adequacy of the witness's testimony in regard to the charge of conspiracy to commit that same crime.[52] Hence in cases involving both a conspiracy conviction and a conviction for a separate offense(s), this Court has evaluated the adequacy of a particular witness's testimony according to different standards, depending on whether the conviction at issue was for conspiracy or for a separate offense.[53]

¶ 33 This Court has never specifically held that the independent corroborating evidence standard that applies to accomplice testimony applies equally to the testimony of a coconspirator, and we decline to do so here.[54] Pink does not claim (apart from his inadequate corroboration argument) that the State's evidence regarding his conspiracy conviction was otherwise insufficient. And we conclude that the evidence presented by the State at trial, including the testimony of Pink's coconspirators, David Lane and Misty Bryant, as well as the victim of their completed conspiracy, Diana Bowman, was more than sufficient to support Pink's conviction for conspiracy to commit robbery with a dangerous weapon. Thus this conviction is affirmed.[55]

51. See, e.g., Moss v. State, 1994 OK CR 80, ¶ 37, 888 P.2d 509, 518 (referring to argument that witness was "a co-conspirator whose testimony must be sufficiently corroborated," when witness was also an accomplice, whose testimony in relation to murder offense did need to be, and was, corroborated).

52. We do not here decide the thorny hypothetical question of whether an individual could ever be an "accomplice to a conspiracy," without also being a coconspirator, whose testimony in relation to the conspiracy would then be subject to the § 742 standard for adequate independent corroboration. In the current case, as in most cases, Lane and Bryant were clearly not mere "accomplices to the conspiracy"—if this is even possible—they were unquestionably parties to the agreement to rob the Dollar General, and hence coconspirators in the conspiracy crime. Hence we hold that their testimony in relation to the primary crime, i.e., the armed robbery, to which they are legally "accomplices," must be evaluated according to the § 742 accomplice testimony standard articulated supra, while their testimony in relation to the conspiracy crime, regarding which they are legally "coconspirators," must be evaluated according to the conspiracy law standards articulated herein.

53. See, e.g., Johns, 1987 OK CR 178, ¶¶ 7–11, 742 P.2d at 1146 (finding that witness was both a coconspirator and an accomplice, but applying § 742 requirement of independent corroborating evidence only to testimony regarding non-conspiracy offenses); Harjo, 1990 OK CR 53, ¶¶ 19–31, 797 P.2d at 343–46 (finding that witness who was a coconspirator was not also an accomplice to the charged offenses, and hence that no ac-

complice corroboration instruction was required).

54. To the extent that Cox v. State, 1986 OK CR 154, ¶¶ 3–7, 726 P.2d 909, 910–11, in fact, applies the § 742 corroboration requirement to the conspiracy conviction at issue in that case (in addition to the presenting a false insurance claim conviction), it is hereby overruled.

55. Judge Lumpkin's attached opinion, concurring in part and dissenting in part, is a troubling one. On the one hand, the opinion happily concurs in the affirmance of Pink's conspiracy conviction and also to significant revisions to our Uniform Jury Instructions, in order to make clear that the § 742 statutory requirement for adequate corroboration of an accomplice's testimony, in regard to crimes such as robbery and murder, does not apply equally to conspiracy convictions. In this regard, i.e., ensuring that our opinions and jury instructions don't make conspiracy convictions harder to get than our caselaw mandates, the opinion calls this Court to act with great care, to "be diligent in the correct use of terminology," to use "a few extra words" in our opinions if necessary, and to "ensure we put the law and facts in context...." After all, that is the hard work that this Court is called upon to do.

On the other hand, the opinion dismisses as overly picky and "law-review-like" the same kind of careful, exacting, precedent-based analysis that leads this Court to reverse Pink's robbery conviction, despite the powerful evidence that he indeed was the mastermind behind the Dollar General robbery. While the attached opinion questions none of the legal principles or authori-

¶ 34 In Proposition II, Pink asserts that convicting him of both conspiracy to commit robbery with a dangerous weapon and the actual robbery with a dangerous weapon violates double jeopardy and constitutes unlawful double punishment. This claim has been rendered moot by this Court's reversal of Pink's conviction for robbery with a dangerous weapon. Hence it is denied.

¶ 35 In Proposition III, Pink claims that the trial court erred in allowing the State to admit evidence, during the first stage of his trial, that he sold guns to Lane and Hellen after they divided up the money from the robbery. The trial court admitted this evidence during the first stage of the trial, after specifically finding that the gun sales were made prior to the termination of the robbery conspiracy. Pink fails to establish that this ruling was erroneous and fails to even articulate how he could possibly have been prejudiced by the ruling in regard to his conspiracy conviction,[56] especially since his jury did not even convict him of possession of a firearm AFCF. This claim is rejected accordingly.

¶ 36 In Proposition IV, Pink claims that his sentence is excessive, particularly because the trial court ordered that his sentences be served consecutively. This Court has reversed Pink's robbery conviction. The remaining conspiracy sentence is certainly not excessive, and is hereby affirmed.

¶ 37 After thoroughly considering the entire record before us on appeal, including the original record, transcripts, briefs, and exhibits of the parties, we find that although Pink's conviction for robbery with a dangerous weapon AFCF must be reversed, his conviction and sentence for conspiracy to commit robbery with a dangerous weapon AFCF should be affirmed.

## Decision

¶ 38 Pink's conviction for **COUNT I**, Robbery with a Dangerous Weapon AFCF, is hereby **REVERSED**. Nevertheless, Pink's conviction and sentence for **COUNT II**, Conspiracy to Commit Robbery with a Dangerous Weapon AFCF, are hereby **AFFIRMED**.

JOHNSON, P.J., LILE, V.P.J. and STRUBHAR, J.: concur.

LUMPKIN, J.: concur in part/dissent in part.

LUMPKIN, J.: concur in part/ dissent in part.

¶ 1 I concur in the Court's decision to affirm the judgment and sentence in Count II (Conspiracy to Commit Robbery with a

---

ties upon which the Court's analysis is based, the opinion simply refuses to accept the implications of these binding standards in the current case. Here, Judge Lumpkin's opinion essentially argues that once the testimony from Pink's cohorts (who are both accomplices and coconspirators) comes in—and today's Court Opinion confirms that this evidence was indeed admissible and properly considered in relation to the *conspiracy* charge—Pink's jury was also free to rely upon it to convict Pink of robbery, despite the (unmet) statutory requirement of adequate corroboration of this evidence in this regard. Judge Lumpkin writes (without citation to any authority): "Once the co-conspirators' statements are properly admitted as substantive evidence of guilt in this sequence of events, that evidence cannot then be withdrawn from the trial and dismissed as not relevant in determining the sufficiency of the evidence for the completed crime." But this is not the law, and none of the cases cited in the attached opinion even remotely suggest that this is the law.

Trial courts regularly admit evidence for one purpose, such as a testifying defendant's prior convictions that are admitted as impeachment evidence, and then tell juries that they may not consider this same evidence for another purpose, *i.e.*, substantive evidence of the defendant's guilt to the charged crime. While it may be very difficult for jurors to resist considering evidence that has been properly admitted for one purpose in relation to another purpose, the task is nothing new and it is unavoidable in our system. Furthermore, the natural human tendency to consider evidence properly admitted for one purpose for a separate and improper purpose is one of the basic reasons that our system relies so fundamentally upon judicial review, in order to preserve the rule of law we so value. This Court is indeed called to act with great care in the task of judicial review that is set before us, and we are called to this level of care and insistence upon the rule of law even when the results, in a particular case, might seem counter-intuitive, unfair, or just plain wrong.

56. The robbery with a dangerous weapon charge has already been reversed.

Dangerous Weapon AFCF), and the analysis concerning the law relating to accomplice testimony being controlled by Section 742 of Title 22, while the law concerning the testimony of co-conspirators is defined by judicial precedence. However, I disagree with the manner in which the Court has applied the law of accomplice to the facts of this case, and must dissent to the decision to reverse and dismiss the conviction in Count I.

¶ 2 I believe a part of the problem with the Court's application, and the results reached, is the sequence in which the Court began its analysis. Rather than following the natural sequence of events as they unfolded in the commission of the crimes, and thus applying the law in that same sequence, the Court works backwards to make the beginning of the case fit the final pre-determined result.

¶ 3 This case starts with the formation of the conspiracy to commit the robbery. As Judge Chapel previously recognized and wrote in *Hackney v. State,* 874 P.2d 810, 813 (Okl.Cr.1994), "[I]n *Johns v. State,* 742 P.2d 1142, 1146–47 (Okl.Cr.1987), this Court held that independent evidence is not necessary where co-conspirator statements are admitted through direct trial testimony subject to cross-examination, because the direct testimony of co-conspirators is not hearsay. A co-conspirator may testify concerning his own participation and his observation of a co-conspirators' conduct."

¶ 4 In *Huckaby v. State,* 804 P.2d 447, 451 (Okl.Cr.1990), this Court cites *Johns* in holding that the *Laske* and *Harjo* rule requiring independent evidence before the admission of a co-conspirator's statements does not apply to the direct in-court testimony of a co-conspirator. *Huckaby* held that a co-conspirator's in-court direct testimony was sufficient independent evidence of a conspiracy and of the co-defendant's participation in it. *Id.*

¶ 5 In the case at bar, our case law does not require any corroboration of the co-conspirator's testimony. However, the State presented both direct and circumstantial evidence at trial that corroborated the co-conspirator's testimony. My reference to the evidence is for illustration purposes only and should not be construed in any way to mean that corroborating evidence of a co-conspirator's testimony is necessary.

¶ 6 The decision today accurately reflects that the law of conspiracy requires evidence of the conspiracy in accordance with the requirements set forth in *Omalza v. State,* 911 P.2d 286 (Okl.Cr.1995) and *Harjo v. State* 797 P.2d 338 (Okl.Cr.1990), prior to the admission of the statements of a co-conspirator, but not independent corroboration of that statement prior to its admission. A conspiracy may be proven by circumstantial evidence "from which the existence of a conspiracy may be inferred." *Hackney,* 874 P.2d at 813. Therefore, evidence of the conspiracy need not be direct but may consist of only circumstantial evidence. Furthermore, once evidence of the conspiracy has been offered, those statements are admissible as substantive evidence of a co-conspirator's guilt.

¶ 7 Accomplice testimony is analyzed differently than co-conspirator testimony as one requires corroboration and the other does not. In *Jemison v. State,* 633 P.2d 753, 755 (Okl.Cr.1981), the Court held that in-court accomplice testimony, corroborated in part by some other evidence, was sufficient independent evidence to connect the defendant to the crime. "The law prescribes no standard for the strength of the corroborating evidence, and there is a failure to corroborate *only* if there be no evidence legitimately having that effect." *Glaze v. State,* 565 P.2d 710, 712 (Okl.Cr.1977) (citing *Hathcoat v. State,* 71 Okla.Crim. 5, 107 P.2d 825 (1940)) (emphasis added). Corroborating evidence may consist of only circumstantial evidence. *Id.*

¶ 8 Repeatedly, this Court has stated that we will take "the strongest view of the corroborating testimony that such testimony will warrant where the sufficiency of the corroborating evidence is challenged." *Barber v. State,* 388 P.2d 320, 325–26 (Okl.Cr.1963). *See also Glaze,* 565 P.2d at 712; *Eaton v. State,* 404 P.2d 50, 53 (Okl.Cr.1965); *Barrett v. State,* 357 P.2d 1020, 1022 (Okl.Cr.1960).

¶ 9 The primary purpose of the accomplice statute (21 O.S.2001 § 742) requiring corroboration of accomplice testimony is to assure that no person is convicted of a crime *solely* on the testimony of an accomplice whose

motive for testifying might be questionable. *Glaze*, 565 P.2d at 712. Accomplices "are motivated by the need to point the finger of guilt at the others involved in order to minimize the appearance of their participation in the felony." *Faulkner v. State*, 646 P.2d 1304, 1308 (Okl.Cr.1982). In this case, the witnesses had no motive for testifying against the Appellant as all of the defendants, with the exception of one, had been charged as a co-conspirator and for armed robbery.

¶ 10 In *Glaze*, there were two independent sources that described the make and model of the defendants' automobile. 565 P.2d at 713. This Court held that circumstantial evidence that the defendant was apprehended in a car similar to the one described by the independent sources was sufficient corroborating evidence of the accomplice's testimony. *Id.*

¶ 11 Accessory testimony, like co-conspirator testimony, and unlike accomplice testimony, does not require independent corroboration. *Faulkner*, 646 P.2d at 1308. This Court has not required corroborating evidence of accessory testimony because like a co-conspirator, "an accessory's testimony does not have the inherent unreliability found in an accomplice's testimony." *Id.*

¶ 12 The Court's decision has parsed the facts into separate events and not chronologically applied the facts to the law. Applying the law to the facts as the testimony unfolded at trial, the judge was first presented with the issue of admissibility of the testimony of co-conspirators, testifying in person, directly identifying the Appellant and describing his role in the planning and execution of the robbery and distribution of the proceeds. This testimony met the *Omalza* and *Harjo* requirements and was admitted as substantive evidence of guilt of Appellant's actions. Therefore, no additional independent evidence was necessary to corroborate the co-conspirators' testimony. Once the co-conspirators' testimony met the *Omalza* and *Harjo* requirements it was up to the jury to either accept or reject the testimony in their deliberations.

¶ 13 The witnesses also testified regarding Appellant's acknowledgment he had someone on the inside supplying him information for the robbery. This fact was confirmed when Bowman called Yahola to report the robbery and Appellant reported he knew the robbery had been completed because of the report from Yahola to him. The opinion wants to dismiss this piece of direct and circumstantial evidence as not being sufficient independent evidence to support accomplice testimony under § 742. Yet, the opinion does so in a vacuum without acknowledging what evidence had already been admitted as substantive evidence of guilt under the law of co-conspirator. Further, the opinion fails to recognize this is a jury question, not a law review article analysis.

¶ 14 This is a case that contains both direct and circumstantial evidence. We apply that long established rule of appellate review derived from *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) and adopted in *Spuehler v. State*, 709 P.2d 202, 203–4 (Okl.Cr.1985) and more recently applied in *Easlick v. State*, 90 P.3d 556, 559 (Okl.Cr.2004) that requires this Court to determine if the evidence were "viewed in the light most favorable to the state would any rational trier of fact have found essential elements of crime beyond a reasonable doubt." I believe when the facts in the present case are viewed in sequence, and the law admitting the evidence applied in the same manner, the judgment of the jury in Count I is supported by sufficient evidence which establishes beyond a reasonable doubt the requirements of 21 O.S.2001, § 742. It is only when the facts and the law are parsed out of sequence that the case can be made that there is not compliance with the statutory requirements. Once the co-conspirators' statements are properly admitted as substantive evidence of guilt in this sequence of events, that evidence cannot then be withdrawn from the trial and dismissed as not relevant in determining the sufficiency of the evidence for the completed crime. Especially, when the co-conspirator and the accomplice are the same parties or individuals. I know of no logical, practical or legal reason to treat them differently in this case. Accordingly, I would affirm the judgment and sentence of both counts.

¶ 15 I would also like to comment on the issue of the OUJI–CR and the Committee Comments. As the opinion points out, this Court must shoulder part of the blame for lack of clear guidance in the law to enable our OUJI–CR Committee to prepare clear, concise instructions on the law. Our failure to be diligent in the correct use of terminology in the appropriate context creates confusion for the Committee, the bench and the bar. Even when it might take a few extra words we should ensure we put the law and facts in context, and if required give historical context to our decisions. We should never paraphrase holdings from prior cases, and we should ensure when we cite holdings we have researched the validity of those cites and the law expressed. While at times we are overwhelmed with the volume of cases that cross our desk, the accuracy and historical correctness of our work must be paramount. Often we are required to take the time to write cases of this type to reset the plumb line to give perspective to both our-

selves, and the practitioners who must apply this law in the courtrooms of our state on a daily basis. I believe each member of this Court is indebted to the members of the Instruction Committee for the hours of labor that has, and continues to go into the creating and updating of the OUJI–CR for the benefit of the courts of the State of Oklahoma. Thankfully, it is an ongoing process that allows for corrections when the need is brought to our attention in this manner. Members of the judiciary and practicing bar should be encouraged to notify the Committee if any difficulties with the uniform instructions are experienced. It is only through that process they remain a viable tool for the administration of justice.