2016 OK CR 21

**Emanuel Dewayne MITCHELL,
Appellant,**

v.

**The STATE of Oklahoma, Appellee.**

No. F–2015–554

Court of Criminal Appeals of Oklahoma.

FILED OCTOBER 7, 2016

ATTORNEYS AT TRIAL, EMANUEL DEWAYNE MITCHELL, PRO SE

KENT BRIDGE, P.O. BOX 1171, OKLAHOMA CITY, OK 73201, STANDBY COUNSEL FOR DEFENDANT

DAVID PRATER, DISTRICT ATTORNEY, SUZANNE LAVENUE, ASSISTANT DISTRICT ATTORNEY, 320 ROBERT S. KERR, SUITE 505, OKLAHOMA CITY, OK 73102, COUNSEL FOR THE STATE

ATTORNEYS ON APPEAL, KATRINA CONRAD–LEGLER, HOMICIDE DIRECT APPEALS DIV., OKLA. INDIGENT DEFENSE SYSTEM, P.O. BOX 926, NORMAN, OK 73070, COUNSEL FOR APPELLANT

E. SCOTT PRUITT, ATTORNEY GENERAL OF OKLAHOMA, JENNIFER B. WELCH, ASSISTANT ATTORNEY GENERAL, 313 NE 21ST STREET, OKLA-

HOMA CITY, OK 73105, COUNSEL FOR APPELLEE

## OPINION

SMITH, PRESIDING JUDGE:

¶1 Emanuel Dewayne Mitchell was tried by jury and convicted of Count I, Murder in the First Degree in violation of 21 O.S.Supp. 2006, § 701.7(B); and Count II, Conspiracy to Commit a Felony (Robbery with a Dangerous Weapon), after former conviction of two or more felonies, in violation of 21 O.S.2001, §§ 421, 801, in the District Court of Oklahoma County, Case No. CF–2009–3297. In a consolidated action, Mitchell was tried by the same jury and convicted of Unauthorized Use of a Motor Vehicle in violation of 47 O.S.2001, § 4–102, in the District Court of Oklahoma County, Case No. CF–2009–3341. In accordance with the jury's recommendation the Honorable Timothy R. Henderson sentenced Mitchell to life imprisonment without the possibility of parole (CF–2009–3297, Count I); twenty-five (25) years imprisonment (CF–2009–3297, Count II); and ten (10) years imprisonment (CF–2009–3341), all to run consecutively to one another. Mitchell appeals from these convictions and sentences and raises ten proposition of error in support of his appeal.

¶2 On May 19, 2009, Mitchell and his co-defendant Anthony Morrison recruited teen-agers Antwun Parker and Jevontai Ingram to rob the Reliable Pharmacy in Oklahoma City. They gave Ingram a gun, Parker a board to block the door, and both boys clothing to wear. The two boys entered the pharmacy, demanding drugs and money. Ingram had a pistol and Parker blocked the front door. The two female clerks ran into a back room. The pharmacist, Jerome Ersland, fired two shots from a handgun toward the boys. Parker fell unconscious and Ingram ran from the store. Ersland followed Ingram, fired three shots, and returned to the store. Ersland stepped over Parker, got another gun, and shot him five times. These final five shots were fatal. Ingram, still running, got into a stolen car driven by Mitchell. They drove a short distance and saw a police car. Mitchell and Ingram jumped from the car and ran in different directions, leaving In-

gram's mask in the car. Mitchell denied any involvement with either the robbery or the stolen car.

¶3 Mitchell was originally tried and convicted of these crimes in April 2011. This Court granted his appeal and remanded the case, finding that Mitchell had been denied the right to represent himself at trial. *Mitchell v. State*, No. F–2011–866, slip op. at 9 (Okl.Cr. June 20, 2013) (not for publication). Mitchell represented himself at his retrial.

¶4 In Proposition I Mitchell complains that the trial court erred in allowing him to represent himself. As we explained in Mitchell's first appeal:

A criminal defendant has a constitutional right of self-representation. *Mathis v. State*, 2012 OK CR 1, ¶7, 271 P.3d 67, 71–72; *Faretta v. California*, 422 U.S. 806, 818–21, 95 S.Ct. 2525, 2532–34, 45 L.Ed.2d 562 (1975). As this court has said, "The test whether a defendant has intelligently elected to proceed pro se is not the wisdom of the decision or its effect upon the expeditious administration of justice." *Johnson v. State*, 1976 OK CR 292, ¶34, 556 P.2d 1285, 1294. A defendant must be warned of the dangers and disadvantages of self-representation, based on all the circumstances of the case. *Mathis*, 2012 OK CR 1, ¶15, 271 P.3d at 74; *Faretta*, 422 U.S. at 835, 95 S.Ct. at 2541. Armed with that information, he must then knowingly and intelligently waive the benefits of counsel. *Mathis*, 2012 OK CR 1, ¶7, 271 P.3d at 71–72; *Faretta*, 422 U.S. at 835, 95 S.Ct. at 2541. No particular knowledge of law or courtroom procedure is required. *Coleman v. State*, 1980 OK CR 75, ¶5, 617 P.2d 243, 245; *Faretta*, 422 U.S. at 836, 95 S.Ct. at 2541. "[A] defendant must be competent to make this decision and must be clear and unequivocal in his desire to proceed *pro se*." *Mathis*, 2012 OK CR 1, ¶7, 271 P.3d at 72. If these requirements are met, a defendant who understands his right of self-representation and has a clear intent to exercise it must be allowed to proceed. *Johnson*, 1976 OK CR 292, ¶37, 556 P.2d at 1296. The possibility that a defendant may later disrupt a trial is not a reason to deny self-

representation before any disruption has occurred. *Coleman*, 1980 OK CR 75, ¶ 5, 617 P.2d at 245. The Court strongly encourages trial courts to appoint standby counsel for a *pro se* defendant. *Mathis*, 2012 OK CR 1, ¶ 17, 271 P.3d at 74–75. *Mitchell*, No. F–2011–866, slip op. at 2–3. Mitchell argues that the trial court failed to ensure that his waiver of counsel was voluntary, knowing and intelligent. He argues that, in fact, he wanted to be represented by appointed counsel, but the trial court denied that request.

¶ 5 Mitchell argues that the entire trial record casts into doubt his initial decision to proceed *pro se*. The record does not support this claim. At a pretrial hearing, the trial court warned Mitchell of the disadvantages of representing himself, ensured he was informed of the charges and ranges of punishment, and asked whether he unequivocally wanted to represent himself. Mitchell said he did. The trial court also appointed attorney Kent Bridge as standby counsel. The trial court explained to Mitchell that he would waive any appellate issue of ineffective assistance of counsel by proceeding *pro se*. The court also granted Mitchell a continuance of several months to allow him to prepare for trial. He had access at the jail to the entire record of the proceedings, including the previous proceedings, and to free computerized legal research.

¶ 6 A thorough review of the record shows Mitchell chose to represent himself. Shortly after the case was remanded, attorney Trevino was appointed as standby counsel for Mitchell. In a status hearing on October 11, 2013, Mitchell—who had complained several times about what he felt was inadequate access to discovery and research materials— seemed to ask that Trevino be appointed lead counsel on the case, rather than standby counsel, and the trial court agreed. At a hearing on January 17, 2014, the court noted that Trevino had been appointed as standby counsel and Mitchell wanted him to be lead counsel. The trial court granted Trevino's request to be removed from the case. The

court appointed Kent Bridge, apparently as lead counsel for Mitchell. However, even after noting that Mitchell was not asking to go *pro se*, the trial court inquired if Mitchell had the materials he needed. The court indicated that it expected the University of Oklahoma Law School Legal Clinic would assist Mitchell in his investigation and research.[1] This appears inconsistent with the order that Bridge was representing Mitchell. After this hearing, Mitchell continued to file motions *pro se*; sometimes he notified Bridge, but sometimes he did not. The State, believing that Bridge represented Mitchell, did not respond to the *pro se* motions.

¶ 7 At a hearing on July 31, 2014, Bridge asked the trial court to determine his status. Bridge said, although Mitchell had affirmed that he wanted Bridge to represent him, Bridge also had information that Mitchell had changed his mind. The *pro se* motions included a request to go *pro se*, a request for new counsel, and a complaint about Bridge's representation, as well as several with no basis in fact or law. Mitchell (who never got Bridge's name right) told the trial court that Bridge wasn't properly representing him, that he did not have the research resources to represent himself, and he wanted new counsel. The court correctly explained that Mitchell was entitled to appointed counsel, but not to counsel of his choice. The court further explained that an attorney must zealously advocate for his client, but was also obligated to follow the law and rules of professional conduct in doing so. Mitchell responded that he would rather represent himself than be represented by Bridge, and stated, "I would like to represent myself because that's a Constitutional right that I have." He then immediately reaffirmed that he wanted to represent himself.

¶ 8 The trial court made a record that Mitchell understood the charges and the ranges of punishment. The court advised Mitchell that, as a nonlawyer, he would be at an extreme disadvantage. Mitchell responded that he would be at more disadvantage if he

---

1. Ultimately, the Clinic did not assist Mitchell, either while he was represented by Bridge or when Mitchell represented himself.

allowed someone to take control of his life, and again, agreed that he unequivocally wanted to represent himself. Mitchell asked for standby counsel to help him prepare, and to get subpoenas and paperwork. The trial court appointed Bridge as standby counsel to assist him. The trial court informed Mitchell that he would be required to follow court rules and the trial court would not advise him regarding rules, objections or admission of evidence. The court advised Mitchell he was waiving any issue of ineffective assistance of counsel on appeal. Again, the trial court asked Mitchell to choose between representation by Bridge and unequivocally representing himself, and Mitchell replied that he would represent himself. The trial court noted that Mitchell had filed numerous handwritten motions, determined his level of education, and found that he could read and write. The court asked about Mitchell's medications and what effect they had on him, and Mitchell replied they made him drowsy. The court found that Mitchell was articulate, coherent, and was competent to understand the nature and consequences of the proceedings and of representing himself. At a later hearing, the trial court granted a continuance of several months, to ensure Mitchell had sufficient time to prepare.

¶ 9 Although Mitchell subsequently, and frequently, asked the trial court for help in preparing his case, he did not ask that Bridge be re-appointed as lead counsel. Mitchell claims that, at the beginning of the second stage of trial, the trial court denied his request that Bridge take over for him. This is not the case. At no time before second stage began, during the presentation of evidence, or when instructions were given, did Mitchell ask or even imply that Bridge "take over for him." After the State's first closing argument, Mitchell asked whether Bridge could give his defense closing. When told he could not, Mitchell waived closing argument. Although Mitchell often claimed that the trial court "forced" him to represent himself, the record shows Mitchell consistently chose to represent himself rather than be represented by appointed counsel—a choice offered to him several times.

¶ 10 Mitchell argues that he had medical issues which interfered with his ability to represent himself. He claims his progressive muscular dystrophy, and the medications it required, left him sleepy and dizzy. During Ingram's redirect examination, Mitchell told the trial court he was having an adverse reaction to his medication and could not continue that day. The trial court determined that Mitchell had been taking this medication for sixteen years, and noted for the record that Mitchell had not expressed or shown symptoms of either his illness or any reaction to his medication in any of the numerous proceedings before the court. Mitchell had felt dizzy the previous day, but had not notified anyone but standby counsel. He also explained that his routine medication schedule allowed him to lay down and rest after receiving it, but the trial schedule had changed his medication times. The trial court accommodated Mitchell's physical condition by taking an extended recess so Mitchell could rest. Afterwards, Mitchell said he was able to proceed for the rest of that day. The record does not show that Mitchell raised any issue with medication or any physical difficulties throughout the rest of the trial.

■ ¶ 11 Mitchell admits that the trial court, as required, informed him of the charges, range of punishment, dangers of self-representation, and waiver of an ineffective assistance of counsel claim on appeal; the court also appointed standby counsel. He argues that the trial court should have gone into more detail, and discussed specific disadvantages Mitchell would face, such as lack of access to a law library. There is no requirement that a defendant receive this specific warning. In fact, we have left precisely what warnings to give a defendant to the discretion of trial courts, within the parameters above, depending on the total circumstances of the case. *Mathis*, 2012 OK CR 1, ¶ 17, 271 P.3d at 74–75.

■ ¶ 12 Mitchell also claims the trial court did not find he was competent to make this decision. However, Mitchell admits that the trial court found on the record that he was competent to waive his right to a lawyer. He argues that finding was not based on a proper competence inquiry. Unless the trial

court has reason to doubt a defendant's competence, no separate determination of competence is required when determining whether a defendant may proceed *pro se. Fitzgerald v. State*, 1998 OK CR 68, ¶ 8, 972 P.2d 1157, 1163; *Godinez v. Moran*, 509 U.S. 389, 401, n.13, 113 S.Ct. 2680, 2688, n.13, 125 L.Ed.2d 321 (1993). The same standard is used to measure a defendant's competency to stand trial and to waive his right to counsel; however, the latter also requires proof that his waiver is knowing and voluntary. *Moran*, 509 U.S. at 400–401, 113 S.Ct. at 2687. Nothing in the record raises any issue that Mitchell was not competent to stand trial, or to waive his right to counsel. The record is replete with evidence that Mitchell's decision was knowing and voluntary. This proposition is denied.

¶ 13 Mitchell claims in Proposition II that the trial court abused its discretion in prohibiting standby counsel from participating more fully in the trial. An abuse of discretion is any unreasonable or arbitrary action made without proper consideration of the relevant facts and law, also described as a clearly erroneous conclusion and judgment, clearly against the logic and effect of the facts. *Neloms v. State*, 2012 OK CR 7, ¶ 35, 274 P.3d 161, 170. Standby counsel is required to be present at all court proceedings to assist a defendant, but the defendant must "maintain control of the case."[2] *Lay v. State*, 2008 OK CR 7, ¶ 9, 179 P.3d 615, 620, *abrogated on other grounds by Harmon v. State*, 2011 OK CR 6, ¶¶ 57–58, 248 P.3d 918, 938–39. Standby counsel is there only to advise, and has no authority to act for the defendant in court. *Parker v. State*, 1976 OK CR 293, ¶ 10, 556 P.2d 1298, 1302. In fact, the nature of *pro se* representation requires some limits on participation of standby counsel. *McKaskle v. Wiggins*, 465 U.S. 168, 177–78, 104 S.Ct. 944, 950–51, 79 L.Ed.2d 122 (1984).

¶ 14 On appeal, Mitchell argues that standby counsel, Bridge, should have been allowed to assist Mitchell with legal questions and procedure. The record shows that Bridge helped Mitchell, outside the jury's presence, with courtroom procedure, including admission of exhibits and evidence. The record also shows that, throughout the pretrial and trial proceedings, Mitchell consistently rejected Bridge's legal advice.

¶ 15 In an August 2014 hearing, the trial court denied Mitchell's request that Bridge be dismissed because he did not need standby counsel. During a September 2014 hearing, Mitchell complained that standby counsel was not assisting him enough. At that hearing, Bridge asked the trial court to clarify his responsibilities as standby counsel. The trial court agreed with Bridge's understanding that Bridge was to respond to Mitchell's questions, convey State filings to Mitchell and file anything Mitchell needed filed, pass investigation requests to the Public Defender investigators, and sit with Mitchell to answer any questions he had during trial. At a later hearing, Bridge again asked for clarification as to his role. Mitchell had several times indicated that—without agreeing to Bridge's appointment—he felt standby counsel should come to the jail, help him with research, help him prepare his case, and show him how to effectively argue before the trial court. The trial court reaffirmed that Bridge was not to train Mitchell in the law, write an opening statement, develop cross-examination questions, or do anything other than stand by during the trial and deliver pleadings, filings and other paperwork as necessary. Before trial began, the trial court stated that, in order to avoid any jury perception that Bridge was controlling the case, Bridge's role was to advise Mitchell on procedures and the law as it applied to those procedures. At the beginning of the second day of trial, the court again clarified Bridge's role; he was to give advice if Mitchell asked, but not to tell Mitchell he needed to object, write notes with questions to ask, or similar actions, to preserve Mitchell's absolute constitutional right to represent himself. Bridge noted that, at Mitchell's request, he had already given him questions to help with introduction of exhibits and impeachment of witnesses; Mitchell had also asked him to help with legal reasoning for objec-

---

**2.** Mitchell's argument, that the trial court was inconsistent in recessing the trial when Bridge could not attend yet preventing him from active participation, appears to misunderstand the requirement that standby counsel be present throughout the entire trial.

tions. Bridge stated he did not think he had overstepped the court's boundaries. During the trial, the court confirmed that Bridge was answering Mitchell's questions on legal procedure, evidence, and witnesses, and Mitchell agreed.

¶ 16 In his brief, Mitchell claims that he requested that Bridge represent him at an October 31, 2014 hearing. The record shows otherwise. Mitchell told the trial court that he planned to have another, unnamed, attorney to represent him. He again strongly expressed his dissatisfaction with Bridge. The trial court noted that no attorney had entered an appearance for Mitchell, and did not grant a continuance at that time. In a subsequent November hearing, Mitchell confirmed that the attorney would not be representing him, but was offering him some out-of-court assistance with motions at no cost. Mitchell again confirmed that he was acting as his own counsel. At his request, the trial court granted a seven-month continuance to allow him more time to prepare. Mitchell also appears to claim that Bridge should have been allowed to take over the case. As we discussed in Proposition I, the record does not reflect that, either before or after the trial began, Mitchell requested that Bridge be appointed to represent him. Although Mitchell had a difficult time preparing his case and representing himself, that is often the nature of *pro se* representation. The trial court did not abuse its discretion in delineating the role of standby counsel. This proposition is denied.

¶ 17 In Proposition III Mitchell claims the felony murder doctrine should not have been applied to his case. We rejected this argument in Mitchell's appeal from his first trial, for the reasons stated in the companion case of *Morrison v. State*, F–2011–624, slip op. at 3–8 (Okl.Cr. June 20, 2013). *Mitchell*, No. F–2011–866, slip op. at 10. This claim is procedurally barred and we need not revisit the issue here. *Smith v. State*, 2013 OK CR 14, ¶ 15, 306 P.3d 557, 565; *Jackson v. State*, 2006 OK CR 45, ¶ 16, 146 P.3d 1149, 1157. This proposition is denied.

¶ 18 Mitchell claims in Proposition IV that the evidence was insufficient to corroborate the testimony of his co-defendant,

Jevontai Ingram. Accomplice testimony must be corroborated by evidence that, standing alone, tends to connect the defendant with commission of the offense. *Simpson v. State*, 2010 OK CR 6, ¶ 13, 230 P.3d 888, 896; *Pink v. State*, 2004 OK CR 37, ¶ 15, 104 P.3d 584, 590; 22 O.S.2011, § 742. The evidence must do more than show the circumstances or commission of the offense. 22 O.S.2011, § 742. There must be at least one corroborating fact, which may be proved by circumstantial evidence, connecting the defendant with the crime. *Pink*, ¶ 16, 104 P.3d at 590–91. Ingram was both an accomplice (to Count I) and a co-conspirator (to Count II); co-conspirator testimony need not be corroborated. *Pink*, ¶¶ 32–33, 104 P.3d at 595–96. Insofar as Ingram was testifying as an accomplice to Count I, his testimony must be corroborated.

¶ 19 Ingram testified that he and Parker met Morrison and Mitchell at Parker's grandmother's house in April 2009. The teenagers saw the two men several times in the next month. A day or two before the crime, Morrison and Mitchell began talking about getting pills from a pharmacy on the south side of Oklahoma City, to take to Tulsa and sell. During the ongoing talk about the pharmacy, one of the men said that a white man and his daughters worked there; they said the white man had back problems and was in a wheelchair and couldn't do anything. On May 19th, the day of the crime, Morrison called Ingram and told him to bring Parker to Devon West's house. The four met there, along with Rozina Sayles. Mitchell drove a light-colored Honda that Ingram had not seen before. Ingram noticed that the steering column was broken and thought the car was stolen. Morrison brought out a backpack full of clothes and put it in Mitchell's Honda.

¶ 20 Ingram testified that Mitchell and the teenagers followed Morrison and Sayles to the south side of Oklahoma City, driving past the pharmacy. During the drive, Ingram and Parker put the clothes in the backpack on over their own clothes, holding the masks and gloves; Mitchell told them to put on the clothes for a disguise. Ingram put on a red shirt and black pants, and had red gloves, while Parker wore a white shirt and sweat-

pants with the OU logo printed on them. There was also a two-by-four board in the car. Mitchell told Parker to put the board in the pharmacy door when they went in so it wouldn't lock behind them. They stopped at a nearby apartment complex (with a horse-shoe-shaped driveway), then drove to a 7–Eleven. Morrison bought some black tape, took a semiautomatic pistol and taped on the magazine, and gave the gun to Ingram. There were no bullets in the clip or the gun. Mitchell saw Ingram put the gun under the passenger seat of the Honda. The men told Ingram to ask for OxyContin and cash. Mitchell drove the teenagers to the pharmacy, but they were nervous and didn't want to go in. Mitchell said he'd let Morrison handle this and drove back to the apartments, where Morrison told them they were going to do this and then he'd take them home. Mitchell drove Ingram and Parker back to the pharmacy. Parker grabbed the board and put on the backpack; Ingram already had his mask and gloves on, and put the gun under his shirt. When Ingram entered the pharmacy Mitchell was still outside with the car. As he went in he saw a blue car with the trunk open parked nearby. Ingram had to push a button and be buzzed in through the pharmacy's heavy security door. When Ersland shot Parker the first time, Ingram ran outside, accidentally colliding with the blue car. Mitchell was gone. Ingram ran around the store and through the neighborhood, while Ersland followed, shooting at him. As Ingram fled, he took off his gloves and the outer clothing that he'd used as a disguise. Mitchell picked Ingram up in the Honda on 58th Street. When they saw a police car, Mitchell fled the moving Honda on foot, leaving Ingram in the car. Ingram jumped out and ran, leaving the mask. As he left, he saw Mitchell in a yard, looking at the car; a white man on a phone was heading towards Mitchell.

¶ 21 Ingram's testimony was corroborated in part by Rozina Sayles. She testified that she, Morrison, and Mitchell saw Ingram and Parker on May 19th at Devon West's house. She and Morrison drove to the south side of Oklahoma City and stopped at a 7–Eleven, where she saw that Morrison had a gun. Mitchell and the teenagers pulled up in a light-colored car. She heard Mitchell and Morrison tell Ingram and Parker to keep the money, because, Mitchell said, they just wanted the pills. They then drove to an apartment complex with a U-shaped driveway. Mitchell pulled up, and she heard the teenagers say that they didn't want to go alone. She heard Morrison say that Mitchell would have to go with them because he'd been there before. After that she saw Mitchell drive away with Ingram and Parker; based on the conversation she'd heard and the gun she saw, she thought they were going to commit a robbery. She said something to Morrison and he told her to stay out of it. They heard gunfire, and Morrison drove to the east side of town, to his mother's house.

¶ 22 Other evidence corroborated Ingram's testimony. (a) The pharmacy had a heavy security door, and to enter customers had to push a button and be buzzed in. (b) The pharmacy surveillance video shows Ingram, carrying something, and Parker, carrying a board, outside the store; then the video shows the two, with their heads covered and wearing gloves, inside the store. (c) The video shows Parker blocking the door open with a board, and there was a board by the door after the crime. (d) Parker was wearing a mask, a white shirt on top of another shirt, OU sweatpants over another pair of pants, and a backpack. (e) Surveillance camera video showed a blue car with its trunk open parked in front of the pharmacy immediately before the crime. (f) Surveillance video showed the path Ingram took when he ran, and showed Ersland following him; the path corresponded to Ingram's description of his actions. (g) Several witnesses saw Ingram run from the pharmacy wearing a red shirt and black pants. (h) Two eyewitnesses saw Mitchell pick up Ingram in the Honda immediately after the attempted robbery and shooting; another eyewitness saw Mitchell driving the Honda immediately before it ran off the road into her yard. (i) A different witness saw the Honda go over the curb into the yard, saw Ingram jump out and run, and then saw Mitchell near the car. (j) Black and yellow gloves were found under a tree next to the yard the Honda ended up in; Ingram's

red shirt and black pants were found where he said he left them, and there was a stocking cap in the abandoned Honda. (k) A witness saw Mitchell standing nearby and yelling immediately after the Honda ran up into his yard, and talked to Mitchell, who said that everything was messed up; Mitchell gave his name and showed the witness his ID, asked to use the man's phone, and called someone to pick him up. (*l*) Police found Mitchell in the yard where the Honda landed after he left it. Other evidence showed the car was stolen. Mitchell was connected to the getaway car and found near the scene of the robbery.

¶ 23 Ingram's testimony was sufficiently corroborated, and the corroborating evidence tended to connect Mitchell to the commission of the crime. Taking the evidence in the light most favorable to the State, any rational trier of fact could find beyond a reasonable doubt that Mitchell committed felony murder. *Easlick v. State*, 2004 OK CR 21, ¶ 15, 90 P.3d 556, 559. This proposition is denied.

■■■■ ¶ 24 In Proposition V Mitchell claims that the trial court failed to properly instruct jurors on the underlying offense of felony murder, attempted robbery. Mitchell did not object to the instructions at trial and we review for plain error.[3] *Day v. State*, 2013 OK CR 8, ¶ 14, 303 P.3d 291, 298. Plain error is an actual error, that is plain or obvious, and that affects a defendant's substantial rights, affecting the outcome of the trial. *Barnard v. State*, 2012 OK CR 15, ¶ 13, 290 P.3d 759, 764. Jury instructions are within the discretion of the trial court, and we review for abuse of discretion. *Burgess v. State*,

2010 OK CR 25, ¶ 20, 243 P.3d 461, 465. Instructions are sufficient where they state the applicable law. *Reed v. State*, 2016 OK CR 10, ¶ 15, 373 P.3d 118, 122. "Trial courts should use the uniform jury instructions if they state the applicable law." *Day*, 2013 OK CR 8, ¶ 14, 303 P.3d at 298.

■■■ ¶ 25 Jurors received the uniform instruction on first-degree felony murder and a modified instruction on attempted robbery with a dangerous weapon, as well as instructions on principals, and aiding and abetting. Instructions 20 and 21, O.R. 846–848, 858. As given, Instruction 21 read:

> A person is in the commission of Attempted Robbery with a Dangerous Weapon when he is performing an act which is an inseparable part of the crime of performing an act which is necessary in order to complete the course of conduct constituting the crime or fleeing from the immediate scene of an Attempted Robbery with a Dangerous Weapon. Escape is considered to be part of a crime.[4]

Taken together, these instructions accurately state the applicable law. Mitchell complains that the jury instructions did not separately include instructions on attempts, as recommended by the Committee Comments for OUJI–CR 4–65. Mitchell does not specify which instructions on attempt he believes should have been given. Mitchell argues this omission meant that the instructions did not comply with the standard jury instructions and thus did not accurately state the law, substantially violating a statutory right. The record does not support this conclusion. While jurors certainly had to find Mitchell

**3.** Although Mitchell admits this is the correct standard, he argues that his failure to object to the instruction was fundamental error, because it is impossible to know what properly instructed jurors would have done. "Fundamental error" as used here is an ambiguous term. Over twenty years ago this Court found that the terms "fundamental error" and "plain error" had been used interchangeably, and held that "plain error" was the correct term. *Simpson v. State*, 1994 OK CR 40, ¶ 2, 876 P.2d 690, 693. On occasion, "fundamental error" has been used to describe plain error which is of constitutional magnitude, and thus subject to the standard of review for constitutional errors. *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967). That cannot be the case here, as the instructional

error of which Mitchell complains relies on statute, rather than a constitutional provision. It is possible that Mitchell is confusing "fundamental error" with structural error; again, that doctrine would not apply here, as the alleged error does not affect the entire trial, and may be reviewed for its prejudice to the defendant. *Robinson v. State*, 2011 OK CR 15, ¶ 3, 255 P.3d 425, 428. The standard for plain error, described *supra*, is the correct standard of review.

**4.** Instruction 21 was a modified version of OUJI–CR 4–65, incorporating the language in *Dickens v. State* holding that escape was part of the crime of armed robbery. *Dickens v. State*, 2005 OK CR 4, ¶ 7, 106 P.3d 599, 600.

guilty of attempted robbery with a dangerous weapon in order to convict him of felony murder, the former offense was sufficiently defined to include the elements. In *Morrison*, the companion case to Mitchell's first appeal, we found that these instructions apprised jurors of all the elements and accurately stated the applicable law. *Morrison*, F–2011–624, slip op. at 8–9 (not for publication). We reach the same conclusion here. Mitchell has failed to show any prejudice from either the instructions given, or omission of (unspecified) instructions on attempt. This proposition is denied.

¶ 26 In Proposition VI Mitchell claims he was denied a fair trial when he was required to wear a "shock sleeve" on his ankle. Mitchell wore the sleeve, but it was not used during the trial. Mitchell not only did not object to this, he agreed with the trial court's decision, stating he was not worried about it being on at all. He has waived all but plain error. The State may not use visible shackles or restraints on a defendant during trial unless their use is necessary to protect essential state interests in that particular case. *Ochoa v. State*, 2006 OK CR 21, ¶ 21, 136 P.3d 661, 667–68; *Deck v. Missouri*, 544 U.S. 622, 628, 125 S.Ct. 2007, 2012, 161 L.Ed.2d 953 (2005); 22 O.S.2011, § 15. Before ordering a defendant to be restrained, a trial court must specifically find, on the record, that he "has engaged in disruptive or aggressive behavior in connection with the proceedings, or made an express or implied threat to disrupt the proceedings or endanger public safety during the trial." *Sanchez v. State*, 2009 OK CR 31, ¶ 34, 223 P.3d 980, 994. The court must also specify what facts support its conclusion, and show that the restraint is "necessary to prevent the disruptive or threatening behavior." *Id*. If restraints are not visible, the defendant must show prejudice before relief is warranted. *Ochoa*, 2006 OK CR 21, ¶ 32, 136 P.3d at 670.

¶ 27 Mitchell's *pro se* status meant that he could not be confined to a seat at the defense counsel table, thereby raising security concerns. At the end of Mitchell's previous trial,

he physically attacked District Attorney David Prater in the courtroom, in front of the jury. In a pretrial hearing, Mitchell admitted the attack and explained his reasons for it. He said he was still mad at Prater and trying to be more mature, but it was possible that it might happen again. The court also heard about a jail phone call, in which Mitchell, discussing the attack on Prater at his first trial, told his mother that they were sure not going to forget about the next incident because he was tired (in context, Mitchell was tired of Prater). Mitchell agreed that the trial court should do whatever was necessary for the safety of all those involved. The shock sleeve was not visible underneath pants and could not be activated accidentally by movement. The trial court specifically found that Mitchell had previously been violent during court proceedings in this case; taking into account Mitchell's entire conversation with his mother, the trial court found that Mitchell intended to disrupt the upcoming trial, and had threatened to do so. The record supports the trial court's decision, and a conclusion that Mitchell agreed with it. Mitchell has failed to show either that the trial court's decision to restrain him with a shock sleeve was error, or that he suffered prejudice from that decision. As there is no error, there is no plain error. This proposition is denied.

¶ 28 In Proposition VII Mitchell claims that evidence of his prior convictions was improperly admitted because the convictions arose from the same transaction or occurrence. Mitchell was charged after two or more former convictions. The Information listed these as: in Oklahoma County District Court Case No. CF–1994–8334, (a) Robbery with a Firearm, (b) Kidnapping, and (c) Armed Robbery, all from August 28, 1995; and in Cleveland County Case No. CF–2006–180, Assault and Battery on a Corrections Officer, from April 7, 2007.[5] The record shows that the parties agreed the convictions in the Oklahoma County case were transactional and only constituted one felony conviction. Before the second stage of trial, standby

---

**5.** At Mitchell's first trial, he was charged with two prior convictions—Oklahoma County District Court Case No. CF–1994–8334, Robbery

with a Firearm, and Cleveland County Case No. CF–2006–180, Assault and Battery on a Corrections Officer.

counsel asked that jurors hear evidence of only two counts, but noted that legally, it was clear that he was only charged with two prior convictions. The entire second page was read to the jury, and the documentary evidence listed all four convictions, but in argument the prosecutor told jurors they should consider the Oklahoma County case to constitute one prior felony conviction. Mitchell argues that the kidnapping and armed robbery convictions from Oklahoma County, which arose from a single guilty plea on the same day, were transactional and should not have been included as separate convictions. However, since Mitchell was only charged with two prior convictions, Mitchell is in effect arguing that the Information and Judgment and Sentence for the Oklahoma County case should have been redacted. To support his claim that the introduction of the exhibits was prejudicial, he relies on *Miller v. State*, 1984 OK CR 33, 675 P.2d 453. There, this Court found that admission of three transactional prior convictions was prejudicial where the prosecutor "based his argument for a long prison term solely on the number of prior convictions." *Id.*, 1984 OK CR 33, ¶ 10, 675 P.2d 453, 455. The record here shows the exact opposite occurred. Despite the exhibits, jurors were told Mitchell was charged with two prior felony convictions. His sentences in Counts II and III were well within the range of punishment, and less than the maximum life sentence possible for each of those crimes. Mitchell has failed to show he was prejudiced by the failure to redact the superfluous information. This proposition is denied.

¶ 29 Mitchell argues in Proposition VIII that evidence improperly admitted during the second stage of trial resulted in excessive sentences. Admission of evidence is within the trial court's discretion; where there is no objection, we review for plain error. *Goode v. State*, 2010 OK CR 10, ¶ 44, 236 P.3d 671, 680. To prove Mitchell's two prior convictions, the State introduced Judgment and Sentence documents from each case, as well as certified copies of the docket sheets and Mitchell's Pen Pack.[6] The Judgment and Sentence for Oklahoma County District Court Case No. CF–1994–8334 shows that sentences for Counts I and IV ran concurrently, with all but the first twenty years suspended. The Judgment and Sentence for Cleveland County Case No. CF–2006–180 showed that all but one year of that sentence was suspended. Mitchell did not object to these exhibits and we review for plain error. *Hunter v. State*, 2009 OK CR 17, ¶ 8, 208 P.3d 931, 933. It is difficult to see precisely what Mitchell complains about; he refers to "extremely prejudicial information" leading to a conclusion that he "was a habitual offender beyond those crimes alleged in the Second Page." He relies on a case in which the defendant's prison record was improperly introduced; here, Mitchell's conduct record was redacted from his Pen Pack and that information was not before the jury. The remainder of the evidence, with one exception, was appropriately admitted to show Mitchell's identity and prior convictions.

¶ 30 That exception, of course, is the information that Mitchell received suspended sentences in his prior convictions. Admission of this information was error. However, the prosecutor did not mention the suspended sentences in questioning or argument, or otherwise draw the jury's attention to them. Mitchell was not prejudiced by admission of the Judgment and Sentence documents. *Mathis*, 2012 OK CR 1, ¶ 31, 271 P.3d at 78; *Hunter*, 2009 OK CR 17, ¶¶ 10–11, 208 P.3d at 933–34. As there was no effect on the outcome, there was no plain error. This proposition is denied.

¶ 31 In Proposition IX Mitchell argues that his sentences were excessive. He admits that he was charged after former felony convictions, his sentences are within the range of punishment, and he did not receive the maximum sentence on either of Counts II or III. He argues they are nonetheless excessive because (a) he represented himself at trial; (b) the evidence was insufficient to support his conviction for felony murder; and (c) er-

---

**6.** Mitchell's conduct records and his prior conviction in this case were redacted from the pen pack; it included his identifying information, the Judgment and Sentence and guilty plea form for the Oklahoma County case, and the Judgment and Sentence from Cleveland County, with the rules and conditions of Mitchell's suspended sentence in that case, and certificates of release.

rors in admission of evidence and instruction. We rejected substantive claims alleging these errors in Propositions II, III, VI and VII. The record does not support any conclusion the trial court abused its discretion in running Mitchell's sentences consecutively. *Neloms v. State*, 2012 OK CR 7, ¶ 35, 274 P.3d 161, 170. Taking into account all the facts and circumstances of the case, Mitchell's sentence is not excessive. *Burgess*, 2010 OK CR 25, ¶ 22, 243 P.3d at 465. This proposition is denied.

¶ 32 Mitchell argues in Proposition X that he was deprived of a fair trial by cumulative error. We found in Proposition VIII that Mitchell was not prejudiced by mention of his previous suspended sentences in the exhibits supporting his prior convictions, and there was no plain error. We found no other error. Where there is no error, there is no cumulative error. *Malone v. State*, 2013 OK CR 1, ¶ 74, 293 P.3d 198, 218. This proposition is denied.

## DECISION

¶ 33 The Judgment and Sentence of the District Court of Oklahoma County is **AFFIRMED**. Pursuant to Rule 3.15, *Rules of the Oklahoma Court of Criminal Appeals*, Title 22, Ch.18, App. (2016), the **MANDATE** is **ORDERED** issued upon the delivery and filing of this decision.

Lumpkin, V.P.J.: specially concur

Johnson, J.: CONCUR

Lewis, J.: CONCUR

HUDSON, J.: CONCUR

LUMPKIN, VICE–PRESIDING JUDGE: SPECIAL CONCUR

¶ 1 I commend my colleague on a well written and thorough analysis of the issues in this case. I specially concur to complement her analysis.

¶ 2 First, Judge Henderson should be complimented on his patient and painstaking assurance that Appellant thoroughly understood the dangers of self-representation and the limited role of standby counsel. The Oklahoma Uniform Jury Instruction Committee–Criminal should be urged to fashion an instruction to inform the jury when a defendant has exercised his constitutional right to represent himself and of the limited role of standby counsel.

¶ 3 Second, I appreciate the opinion's guidance to appellate counsel regarding the objective test that must be met to succeed on appeal with a claim of plain error and laying out the legal distinction between plain error and structural error.[1] To further enlighten those lawyers who serve as appellate counsel in criminal cases as to how they must analyze plain error, I would add the following additional guidance. In footnote 3, this Court recognized the foundational principles of *Simpson v. State*, 1994 OK CR 40, 876 P.2d 690, which sets the plumb line of plain error analysis. *Simpson* laid to rest the undefined term "fundamental error" and applied the principles of the Oklahoma Evidence Code, 12 O.S. § 2101 *et. seq.* In giving a more thorough breakdown of the plain error analysis, the Court in *Hogan v. State*, 2006 OK CR 19, ¶ 38, 139 P.3d 907, 923, set forth the step by step process for raising and analyzing a proposition of error based on plain error. Under this test, this Court determines whether the appellant has shown an actual error, which is plain or obvious, and which affects his or her substantial rights. This Court will only correct plain error if the error seriously affects the fairness, integrity or public reputation of the judicial proceedings or otherwise represents a miscarriage of justice. *Jackson v. State*, 2016 OK CR 5, ¶ 4, 371 P.3d 1120, 1121 (*quoting Hogan*, 2006 OK CR 19, ¶ 38, 139 P.3d at 923); *Levering v. State*, 2013 OK CR 19, ¶ 6, 315 P.3d 392, 395; *Simpson*, 1994 OK CR 40, ¶¶ 10, 26, 30, 876 P.2d at 694, 699, 701.

¶ 4 To provide effective assistance of appellate counsel, lawyers must utilize the analysis that puts into legal perspective the viability of the challenge, rather than depend on the emotional use of a particular word. Of course, the best representation at trial

---

1. For a discussion of the parameters of structural error see my separate writing in *Golden v. State*, 2006 OK CR 2, 127 P.3d 1150 (Lumpkin, V.P.J. dissent).

evolves through trial counsel raising objections and preserving alleged errors rather than leaving appellate counsel to clean up the record. Over my tenure on this Court, the representation of defendants by attorneys from the Oklahoma Indigent Defense System and the Offices of the Public Defender of both Oklahoma and Tulsa Counties has improved substantially. However, there is always room to grow in the profession. It is this Court's responsibility to give clear, consistent interpretation of the law that allows all members of the legal profession, whether judge, prosecutor or defense counsel, the perspective they need to fulfill their role in the judicial process. This opinion provides that guidance.